STEFFES (Mary), Administratrix, Appellant, v. FARMERS
    MUTUAL AUTOMOBILE INSURANCE COMPANY, Re-
    spondent.
STEFFES (Emmanuel), Appellant, v. SAME, Respondent.

*April 10—May 5, 1959.*

For the appellants there were briefs and oral argument by *Harry A. Speich* of Mineral Point, and *Richard R. Rynders* of Madison.

For the respondent there was a brief and oral argument by *Frank D. Hamilton* of Dodgeville.

CURRIE, J.   The following issues are presented on this appeal:

(1) Is there any credible evidence to sustain the jury's findings that both Bernard and Emmanuel Steffes assumed the risk of Walsh's negligent management and control?

(2) Was prejudicial error committed by the trial court in the conduct of the trial which necessitates the directing of a new trial?

(3) Were the damages determined by the jury so low as to indicate that the verdict was the result of perversity, passion, or prejudice?

*Assumption of Risk.*

On Saturday evening, July 23, 1955, the two Steffes brothers, Walsh, and one Norbert Palzkill met in a tavern at Mineral Point at approximately 9 o'clock p. m. Palzkill and the Steffes boys were in their early twenties in age and it reasonably can be assumed that Walsh was in this same age group.

They had a drink of beer apiece at this Mineral Point tavern and then drove in Walsh's car to Dodgeville. There they stopped at another tavern and had one small bottle of beer apiece. From there they went to Ridgeway and made a further stop at a tavern. At the Ridgeway tavern they each indulged in a "shot" of whiskey. After leaving Ridgeway they drove easterly to the "Club 18," which is a combination dance hall and tavern, situated a little west of Mt. Horeb.

They arrived at Club 18 at approximately 11 p. m. and stayed there until the bar closed at 1 a. m. Palzkill and the Steffes boys spent most of their time while there playing cards with two other friends in the bar and had beer to drink. While Walsh went into the dance hall for a short period he also spent most of his time in the bar portion of the premises with other friends. It is uncertain just how much drinking Walsh did at the Club 18. One Kort, a dis-

interested witness, testified to having seen Walsh with a group of companions seated in a booth in the tavern portion of the premises, and that he was sure that Walsh had drunk at least two bottles of beer while there. Gerald Lease, a friend of Walsh's, testified that Walsh and he had had two "drinks" together at the Club 18 bar. Lease was certain that these two drinks were at the bar and not while seated in the booth. This gives rise to the inference that the drinking testified to by Lease was in addition to that observed by Kort.

Emmanuel Steffes, Palzkill, and Lease testified that Walsh **was not** under the influence of intoxicating liquor and appeared normal when their party left Club 18 at 1 o'clock to drive back to Mineral Point in Walsh's car. On the other hand, Kort was asked the following question as to Walsh's condition while at Club 18 and gave the following answer thereto:

"*Q*. Mr. Kort, did you make any conclusion at that time as to whether or not James Walsh was under the influence of intoxicating liquors? *A*. Well, I couldn't pin-point it right on the line but I will say that all at the table there were making big talk. Ordinarily they wouldn't do that if they had been sober and were just talking about ordinary things. It was big talk. Maybe someone would say, 'Oh, you think you are pretty big, don't you,' or such stuff and I think that the liquor actually was the thing that was doing that."

Lease and his party had left Club 18 ahead of the Walsh car, both cars proceeding in a westerly direction. Between Club 18 and Barneveld, Lease had stopped his car on the north side of the highway in order that one of his passengers, who had become sick, could get out and vomit. Walsh, when he approached, apparently recognized the Lease car and proceeded past it, turned around, and then came back and parked his car on the north side of the highway facing east a short distance to the east of the Lease car. Both Lease and Walsh got out of their cars and met between the two

vehicles and conversed together for fifteen or twenty minutes. Lease's version of this conversation was as follows:

"Well, we was talking there and I got to know Jimmy [Walsh] through his brother and he kind of kidded me, 'Why don't you come down and see me?' He said, 'You never come to see me any more after Jerry has gone back.' I said I would come back the next night and we would go out together. And Jim said I wouldn't do it, I was just kidding. I said, 'No, a man is only as good as his word.' And he said, 'That is right.' And we shook on it."

Thereafter, the Lease car proceeded on its way. Walsh had to turn around before resuming his course toward Mineral Point. He was also delayed slightly by having to let another westerly bound automobile proceed before making such turn, and the Walsh car did not catch up with or pass the Lease car before the accident. The accident happened at a point about two miles to the west of such last-described stop.

One Saunders was an eyewitness to the accident. Saunders was driving a car in a westerly direction on Highway 151 at a speed of 50 miles per hour when Walsh passed Saunders on an upgrade about 300 yards to the east of the crown of a hill. At this point Highway 151 has a concrete pavement 20 feet in width with eight-foot gravel shoulders. At the time of such passing another car was approaching from the opposite direction which had to take to the south shoulder in order to avoid a collision. According to Saunders the three cars were then abreast of each other.

After such passing Walsh got back in his own traffic lane and then lost control of his car. It first veered to the right with its right wheels on the shoulder. Then it turned left and crossed the pavement and went down a steep embankment on the south side of the highway. It struck a utility pole breaking the same. Walsh was instantly killed and Bernard Steffes received fatal injuries from which he

died two days later. The tire marks made by the right wheels of Walsh's car on the gravel shoulder on the north side of the pavement were 91 feet in length and the distance from where these marks commenced to the place where the car struck the pole was 537 feet.

The testimony is undisputed that none of the three passengers lodged any protest with Walsh as to the manner in which he operated his automobile prior to the accident.

The appellants place great reliance upon the case of *Webster v. Krembs* (1939), 230 Wis. 252, 282 N. W. 564, which determined that a guest cannot be held to have assumed acts of negligence of the host driver which occurred within a period of three and one half to four seconds. This principle was also applied in *Holtz v. Fogarty* (1955), 270 Wis. 647, 651, 72 N. W. (2d) 411. It is appellants' contention that the first act of negligent operation on Walsh's part was the passing of the Saunders car in the path of the oncoming automobile from the opposite direction, and that this occurred less than four seconds before Walsh lost control of his car.

However, it was the position of the learned trial court that the jury did not base their findings of assumption of risk upon something which occurred during the last four seconds preceding the crash, but was based upon the testimony of the drinking of intoxicating liquor which had taken place on the part of Walsh. In other words, this was a drinking-companion case such as confronted this court in *Frey v. Dick* (1956), 273 Wis. 1, 76 N. W. (2d) 716, 77 N. W. (2d) 609, and *Diedrich v. Lukasavitz* (1959), 6 Wis. (2d) 466, 95 N. W. (2d) 267.

The jury was not conclusively bound to accept the testimony of Emmanuel Steffes, Palzkill, and Lease as to Walsh's condition of sobriety when he left Club 18 and he and his passengers entered his car for the trip home. The members of the jury could also give weight to Kort's testi-

mony that Walsh and his drinking companions were beginning to show the effects of the liquor consumed by them. Other pertinent testimony was Walsh's conduct in stopping his car on the wrong side of the road in order to hold a fifteen-or-twenty-minute conversation after one o'clock at night with Lease in whose company he had just spent part of the evening.

The testimony disclosed that Walsh had the reputation of being a good driver. The jury also could well conclude that his passing of the Saunders car as he did and his subsequent loss of control of his car would not have occurred if his prior consumption of liquor had not appreciably interfered with his care and management of his automobile. Where passenger guests in the position of the Steffes boys have been present when the host-driver has done his drinking of intoxicants, and they get into the automobile with him, they can well be found to have assumed any act of negligent operation which is the result of such drinking. The fact that the host-driver may not have appeared to such guests to have been affected by such drinking does not preclude the jury from finding assumption of risk.

The evidence does not disclose how close the card-playing group containing the Steffes boys was to Walsh in the Club 18 bar when Walsh did the drinking which was observed by Kort and Lease. Being together in the same room, the jury could well infer that the Steffes brothers also observed such drinking.

We conclude that there was ample evidence to sustain the jury's findings of assumption of risk.

### Alleged Errors of the Trial Court.

(a) *The instructions to the jury.* The appellants attack the trial court's instructions given with respect to questions 3 and 4 of the special verdict which inquired as to whether

each of the Steffes brothers had assumed the risk of Walsh's negligent operation of his car. Counsel for the appellants submitted no request to the trial court for the giving of any specific instructions with respect to assumption of risk. We, therefore, in reviewing the instructions given, shall examine the same only to determine: (1) Whether they were sufficiently adequate to enable the jury to pass on the issue of assumption of risk intelligently; and (2) whether they contained any erroneous statements of fact or law.

The instructions, which were given on this issue of assumption of risk, read as follows:

"Now, as to these two questions relating to assumption of risk upon the part of Bernard Steffes and Emmanuel Steffes, respectively, you are instructed that assumption of risk involves, or includes, three elements, namely: First, a hazard or danger inconsistent with the safety of the guest; secondly, knowledge or appreciation of the hazard by the guest; and thirdly, acquiescence or willingness on the guest's part to proceed in the face of such danger.

"A guest will be considered to assume the risk of any course of driving or conduct of the driver against which he does not protest or object that has persisted long enough to give the guest a reasonable opportunity to protest or object and thus indicate dissent or disapproval of the manner of driving. Failure to protest or object under such circumstances is considered as being an implied acceptance of the driver's conduct.

"While the guest who fails to make timely protest or objection against negligent driving will be held to acquiesce in and consent to the risk of injury resulting therefrom, such duty to protest or object does not arise until the guest, under all the circumstances existing at the time in question, has had a reasonable time and opportunity to ascertain or know of and appreciate the improper conduct of the driver and the risk attending the same and to enable him or her to protest against or object to the driver's conduct in that respect. The law, however, does not cast upon the occupant of an automobile any duty with reference to the manner in which it is

momentarily managed by the driver. The momentary management of an automobile should be left to the driver, and the guest may assume that the driver is expected to understand the machine and appreciate the control which he has over it and what he can do with it better than does the guest or passenger.

"As to these two questions, that is, questions 3 and 4, relating to assumption of risk, you are further instructed that before you can consider any evidence as to the drinking of intoxicating beverages by James Walsh in arriving at your answer to either of these questions you must first determine that his consumption of intoxicating beverages appreciably interfered with his care and management of the car. If you are convinced that the drinking of intoxicants by Walsh appreciably interfered with his care and management of the car then you may consider such evidence concerning his drinking in determining your answer to questions 3 and 4; if you are not so convinced then you should not consider the evidence as to his drinking in arriving at your answer to either of these two questions.

"If you are convinced that the drinking of intoxicating beverages by James Walsh appreciably interfered with his care and management of the car and if you are also convinced that Bernard Steffes knew or ought to have known that Walsh had been drinking to an extent likely to impair his ability to operate and control the automobile then you must find that Bernard Steffes assumed the risk and your answer to question 3 should be 'Yes.' Likewise, if you are convinced that the drinking of intoxicating beverages by James Walsh appreciably interfered with his care and management of the car and if you are also convinced that Emmanuel Steffes knew or ought to have known that Walsh had been drinking to an extent likely to impair his ability to operate and control the automobile then you must find that Emmanuel Steffes assumed the risk and your answer to question 4 should be 'Yes.' "

We are of the opinion that such instructions were free from error and adequate in scope. The appellants complain that there was a failure to include a statement to the effect that, in considering the drinking by Walsh, the jury should

not find assumption of risk by either Steffes boy unless he knew, or should have known, that Walsh was under the influence of intoxicating liquor. *Topel v. Correz* (1956), 273 Wis. 611, 79 N. W. (2d) 253, and *Topel v. Correz* (1958), 3 Wis. (2d) 495, 89 N. W. (2d) 295, are cited in support of such contention. However, those two appeals did not present a drinking-companion situation. On this point, see 273 Wis. at page 614. In the instant quoted instructions the jury were charged that assumption of risk includes three elements, one of which is knowledge or appreciation of the hazard by the guest. The evidence tending to establish this element was the knowledge which the Steffes brothers had of the consumption of intoxicating liquor by Walsh at the four taverns visited by them.

(b) *Exclusion from evidence of Wisconsin's Manual for Motorists.* The plaintiffs offered in evidence pages 22 and 23 of Wisconsin's Manual for Motorists published by the motor vehicle department. These two pages of such manual set forth the distances required to stop an automobile at certain specified speeds. Counsel for the defendant objected to the admission thereof on the ground that the same were irrelevant and immaterial under the issues, and such objection was sustained. The appellants attack such ruling.

We cannot perceive how such ruling could be prejudicial at this stage of litigation in view of the jury's findings of assumption of risk. We consider such official publication of the motor vehicle department to be competent evidence to establish the statistics set forth on pages 22 and 23. However, statistics as to stopping distances, or the time required to stop a vehicle traveling at a specified speed, have no relevancy to the issue hereinbefore considered with respect to the guests' assumption of risk. No challenge has been made here with respect to the appellants' contention that a protest made to Walsh by the guests during the last four seconds preceding the crash would have availed nothing. It is very

apparent that the jury did not base its findings of assumption of risk on anything which transpired during such last four seconds.

(c) *Exclusion of contents of letters.* Bernard Steffes served in the armed services for a two-year period ending December 10, 1954. During part of such military service he was stationed in Korea. When his mother, Mary Agnes Steffes, was on the stand she testified that she had received letters from Bernard. She was asked by one of plaintiffs' attorneys to testify to the contents of such letters. An objection was entered by defendant's counsel as to the relevancy of the same which was sustained. Appellants challenge such ruling.

The appellants contend that the contents of such letters were relevant on the question of whether Bernard had expressed an intent to return to the family farm and not to marry. If such letter contents possessed any relevancy it was confined solely to the issue of damages in the wrongful-death action. Inasmuch as the sustaining of the finding with respect to Bernard's assumption of risk bars the cause of action for wrongful death, any ruling as to evidence bearing on damages is immaterial and nonprejudicial.

(d) *Admission of unsworn written statement of Emmanuel Steffes.* As a part of the plaintiffs' case Emmanuel Steffes was called as a witness and testified at length. He was also subjected to a thorough cross-examination by defendant's counsel. After the plaintiffs rested, the attorney for the defendant, as part of the defendant's case, called Emmanuel as an adverse witness. As such adverse witness he was asked about a certain signed written statement of the facts relating to the accident that he had given to a representative of the defendant Insurance Company. Emmanuel admitted that he had signed such statement. Certain portions of such statement were read to the witness and he admitted that the same were contained therein. All of the

foregoing took place with only one objection being voiced by plaintiffs' attorneys. This one objection that was made had nothing to do with the calling of Emmanuel as an adverse witness nor with the questions put to him about the giving and contents of the unsworn written statement.

Counsel for the defendant had the right to call Emmanuel Steffes as an adverse witness even though counsel had previously cross-examined Emmanuel when he was on the stand as a witness for the plaintiffs. However, the questions propounded to him as such adverse witness should have related to facts not covered in the cross-examination. This is because unnecessary repetitions should be avoided. The giving of the unsworn statement to the insurance representative had not been gone into on the prior cross-examination and, therefore, was a proper subject for interrogation when Emmanuel was later called as an adverse witness by the defendant.

The complaint of plaintiffs' attorneys is that the use of the unsworn statement was confined to impeachment purposes, and it should have been made use of by the defendant's counsel in his original cross-examination of the witness. This contention overlooks the fact that Emmanuel Steffes was a party plaintiff and that the facts set forth in the unsworn statement as to the drinking by him and his companions was an admission against interest. Therefore, it constituted substantive evidence in itself and was admissible as part of the defendant's case.

In any event the plaintiffs waived any right to rely on such alleged error on this appeal by failing to enter proper objections at the trial.

### Inadequacy of Damages.

The trial court answered the question in the special verdict, which inquired as to the medical, hospital, and funeral expenses of Bernard Steffes, by inserting the sum of

$1,251.50. The jury determined the mother's pecuniary loss resulting from his death to be $1,050, and the loss of his society and companionship to be $1,000. We agree with the conclusion of the trial court that these findings do not establish perversity, passion, or prejudice on the part of the jury.

Bernard was twenty-four years of age, and his mother sixty-five, at the time of his death. The mother and her children owned undivided fractional interests in the family farm which was operated together by the mother, Bernard, and Emmanuel. There is no evidence establishing any amount in dollars which Bernard had ever contributed to the mother. He did buy an automobile and place it in his mother's name. This does not establish that a gift of the same was intended because it might be inferred that this had been done in order to serve some purpose of his own. The amount that a jury awards in a wrongful-death action for loss of society and companionship lies peculiarly within the province of the jury.

The plaintiffs also contend that the sum of $2,000 fixed in the verdict for Emmanuel Steffes' personal injuries was wholly inadequate. His actual hospital and medical bills were only $75. His injuries consisted of a badly sprained left ankle, a cut on the chest, a bruising of the chest area near the breastbone, and numerous contusions. He complained at the trial of having suffered from headaches, chest pains, and soreness in his ankle. His attending physician expressed the opinion that the only permanent injury was to the ankle. We cannot hold that the allowance of $2,000 for such personal injuries is so inadequate as to indicate perversity, passion, or prejudice on the part of the jury,

*By the Court.*—Judgments affirmed.