TOMMY EDWARD HUGHES, BY HIS NEXT FRIEND, C. E. HUGHES v. PAUL DAVID VESTAL AND DONALD WAYNE VESTAL.

(Filed 2 June, 1965.)

**1. Evidence § 24—**

Even a competent public record or document must be properly identified, verified or authenticated by some recognized method before it may be introduced in evidence.

**2. Automobiles § 38—**

A chart or table of distances required to bring automobiles traveling at particular speeds to a stop, even though prepared by the Department of Motor Vehicles as an aid to driver education, is incompetent in evidence, even as a guide, to show at what distance the particular plaintiff could have stopped his car under the particular circumstances of the accident in suit.

**3. Evidence § 16—**

A chart of distances at which motor vehicles traveling at given speeds can be stopped is not competent in evidence as experimental evidence, since an experiment ordinarily involves the re-enactment of the occurrence under investigation under substantially similar circumstances, and must ordinarily be introduced in evidence by the testimony of the experimenter.

**4. Evidence § 3—**

While the courts may take judicial notice of reaction time of motorists and the distance at which a vehicle traveling at a given speed can be stopped, the courts can do so only within recognized judicial limits with respect to whether a particular result is possible or impossible as a matter of common knowledge, but the courts cannot take judicial notice of precise reaction times or stopping distances set forth in a chart or published table.

**5. Same—**

Matters of which a court will take judicial notice are necessarily uniform or fixed, and a disputable matter cannot be classified as common knowledge.

**6. Appeal and Error § 4—**

Where plaintiff's action is dismissed upon the jury's verdict answering the issues of negligence and contributory negligence both in the affirmative, defendant is not the party aggrieved by the judgment and may not appeal for the purpose of presenting his contention that the court erred in refusing to nonsuit plaintiff's action, but may appeal from nonsuit of his counterclaim against plaintiff.

**7. Automobiles § 41f—**

Evidence that defendant's car, headed west, was parked, with the parking lights burning, on the south side of the highway, extending 4 to 4½ feet onto the hard surface, that it could be seen some 300 feet to the west from which plaintiff approached, and that plaintiff's vehicle left skid marks for some 145 feet before impact in such manner as to indicate loss of control, and collided with defendant's car, *held* sufficient to be submitted to the jury on the issue of plaintiff's negligence upon defendant's counterclaim for damages to his car.

**8. Automobiles § 9—**

> Stopping on a highway in violation of G.S. 20-161 is negligence *per se*, but whether such violation is the proximate cause of injury in a particular case is ordinarily a question for the jury.

APPEAL by plaintiff and defendant Donald Wayne Vestal from *McConnell, J.*, October 1964 Civil Session of DAVIDSON.

Action to recover damages resulting from a collision of automobiles.

This is plaintiff's version of the occurrence: About 10 minutes after midnight on 19 May 1963 plaintiff (17 years of age) was operating an Oldsmobile eastwardly on Cid Road (Rural Public Highway 2318) in Davidson County. It is an asphalt road, 16 feet wide. When, or just before, plaintiff reached the crest of a hill, he saw about 100 to 150 feet in front of him dim lights of another vehicle in his lane of travel; he couldn't tell at the moment whether the vehicle was standing, moving toward him or entering the highway. The hill obstructed his view until he was at or near its crest. Plaintiff's speed was 50 to 55 miles per hour (the speed limit at this point was 55); he applied brakes but could not stop in time to avoid collision. The Oldsmobile was equipped with power brakes in good condition; the tires were relatively new and had good tread. The right front of the Oldsmobile collided with the right front of the other vehicle, a Ford. The Ford had been parked and was standing on the south side of the highway, headed west, partly on the shoulder and extending 4 to 4½ feet onto the hardsurface. The shoulder at that point was 2 to 2½ feet wide. The Ford was registered in the name of Paul David Vestal. It had been parked there, in front of the home of Edsel Harris, by Donald Wayne Vestal (Donald), son of Paul David Vestal. Donald, age 23, was a member of his father's household. There was a private driveway leading from the highway into the Harris premises, the driveway was suitable for parking vehicles off the highway. As a result of the collision plaintiff suffered bodily injury.

Plaintiff instituted this action against the Vestals, father and son. He alleges that his injuries were caused by defendants' negligence, consisting of parking the Ford on the paved portion of the highway when it was practicable to park it off the highway, parking it without leaving an unobstructed width of 15 feet of pavement, parking it at a place where there was not an unobstructed view of the vehicle for 200 feet in both directions, and parking it on the south side of the highway headed west without proper lights.

Defendants' version: Donald had taken Doraleen Harris, daughter of Edsel Harris, to a movie. Upon their return, Donald had parked the Ford, parking lights on, in front of the walkway to the Harris home and as far on the shoulder as he could get. He did not park in the gravel driveway because Mrs. Harris was ill and the noise would dis-

turb her. Donald and Doraleen walked to the front porch and were talking. A car, going east, passed without incident. The weather was clear and the highway was dry. A few minutes later they heard the roar of the Oldsmobile approaching, going east also. There was no other traffic. Then they heard tires "squalling." The Oldsmobile skidded forward in an irregular course. ". . . the headlights (were shining) out in the woods like maybe the car was in a broadslide because the whole woods were lit up. He seemed to skid along like that, and then hit" the Ford. When the cars collided it "sounded like dynamite." The Ford was knocked backwards 36 feet and came to rest in the Harris yard. The Oldsmobile went 85 feet after the collision and stopped on the north side of the highway. After the collision tire marks were found leading from the Oldsmobile west 230 feet. From the point of collision these marks extended 145 feet west; they "swayed" in an irregular line — they "started off sort of swayed, and then swayed back across the road, sort of swaying mark." The marks began 50 feet or more west of the crest of the hill. By actual test, made later, the lights of a car, parked as the Ford was, could be seen a distance of 300 feet by a motorist approaching from the west. The highway is straight. Plaintiff lived a short distance from the place where the accident occurred and was familiar with the highway. Donald was employed and earned wages; he lived in the home of his father but paid board. Though the Ford was registered in his father's name, it was Donald's property. He bought it, paid for it, used it, and paid all expenses of operation and repair.

Defendants aver that plaintiff was contributorily negligent in that he was operating the Oldsmobile in excess of 55 miles per hour and at a speed greater than was reasonable and prudent and failed to keep a reasonable lookout and maintain proper control. Donald counterclaimed for damage to the Ford.

At the close of all the evidence the court sustained the motion of Paul David Vestal for nonsuit, and also plaintiff's motion for nonsuit of Donald's counterclaim. Issues were submitted to the jury with respect to plaintiff's cause of action against Donald. The jury found Donald negligent and plaintiff contributorily negligent. Judgment was entered dismissing plaintiff's action and Donald's counterclaim. Plaintiff and Donald appeal.

*Walser, Brinkley, Walser & McGirt for plaintiff.*
*Jordan, Wright, Henson & Nichols and Hubert E. Olive, Jr., for defendant Donald Wayne Vestal.*

MOORE, J. We first consider plaintiff's appeal.

Plaintiff contends that the court erred in the admission of certain evidence bearing on the contributory negligence issue. The jury resolved that issue against plaintiff, thereby precluding any recovery of damages by him. Defendant alleged, *inter alia*, that plaintiff's speed at the time he first became aware of the presence of the Vestal car was in excess of the maximum speed limit of 55 miles per hour. There was no specific testimony as to plaintiff's speed other than the testimony of plaintiff himself. Plaintiff fixed his speed at 50 to 55 miles per hour. There was, however, testimony that plaintiff's car left 230 feet of tire marks — 145 before reaching the point of collision, and 85 from that point to the place the car came to rest. For proof of excessive speed, defendants offered and the court admitted in evidence, over the objection of plaintiff, a chart entitled "Stopping Distance from Different Speeds with Good Brakes" — the back page of the 1959 "Driver's Refresher Handbook of Traffic Laws and Highway Safety," published by the North Carolina Department of Motor Vehicles. Plaintiff also objected to the following procedures: (1) Counsel for defendants, referring to the chart, stated to the jury, ". . . fifty miles per hour, driver sees danger, 55 feet driver's thinking distance; driver applies brakes 156 feet; vehicle braking distance, 211 feet; car stops here." (2) The court instructed the jury as follows:

> "The Court allowed the defendant to introduce in evidence the back page of the driver's license instruction book with which many of you are familiar. In two recent cases our Supreme Court referred to this manual, so this Court allowed it to be introduced into evidence; and the defendant brought out from a chart which appears therein which appears to show the average stopping speed under average conditions, including road conditions, tire conditions, car conditions, taking into consideration that as to a car with good brakes and different road conditions, the average stopping speed from braking time when driver first sees danger when traveling at fifty miles an hour was 211 feet, including 55 feet reaction time or thinking time of driver and getting his foot on the brakes, and 156 feet for braking time. I instruct you that you will consider this along with all the other evidence, remembering that this is just evidence as to the  average that some persons have found and have put in this chart — the average distance that a car with good brakes would stop under average road conditions."

Plaintiff's objections were well taken; the chart is incompetent and its admission in evidence was clearly improper and prejudicial.

In the first place, no foundation was laid for the introduction of the chart. It was not identified, verified or authenticated by witnesses

or other recognized method. Stansbury: North Carolina Evidence (2d Ed.), §§ 153, 195, pp. 379-381, 512, 513. Furthermore, the chart does not qualify as an "experiment," as that term is ordinarily understood in the law of evidence. ". . . an experiment ordinarily involves the re-enactment of an occurrence under circumstances substantially similar to those which attended the actual occurrence, and for the experiment to be competent those attending circumstances must be understood and simulated with reasonable certainty . . . The experiment should speak for itself and be complete within itself. 'To be admissible in evidence . . . the result of the experiment must have a legitimate tendency to prove or disprove an issue arising out of such occurrence.' " *Service Co. v. Sales Co.*, 259 N.C. 400, 412, 131 S.E. 2d 9. An experiment is introduced in evidence by the testimony of the experimenter. Some courts have declared that reaction time or the distance required to stop a given vehicle at a given speed under given conditions of road surface is a proper matter for expert opinion. *Young v. Patrick*, 153 N.E. 623 (Ill.); *Knight v. Knight*, 324 P. 2d 797 (Wash.); *Mathews v. Carlson*, 130 S. 2d 625 (Fla.). There were no expert witnesses in the instant case and no one testified even by reference to the chart. An expert witness must be better qualified than the jury to draw appropriate inferences from the facts, and his testimony must be based on sufficient data. Stansbury (2d Ed.), § 132; *Service Co. v. Sales Co., supra.* Courts look with disfavor upon attempts to reconstruct traffic accidents by means of expert testimony, owing to the impossibility of establishing with certainty the many factors that must be taken into consideration. *Shaw v. Sylvester*, 253 N.C. 176, 116 S.E. 2d 351. However, in *State v. Gray*, 180 N.C. 697, 104 S.E. 647, expert testimony as to the distance within which a certain truck could be stopped when going at a certain rate of speed was held admissible. But, of course, an unauthenticated chart purporting to show absolute stopping distances is not expert "testimony" (evidence).

Without regard to the lack of proper formality in authenticating and presenting the information contained in the chart, we pass to the consideration of the information itself. The court charged that the chart "appears to show the average stopping speed under average conditions, including road conditions, tire conditions, (and) car conditions." Further: "I instruct you that you will consider this along with all the other evidence, remembering that this is just evidence as to the average that some persons have found and have put in this chart — the average distance that a car with good brakes would stop under average road conditions." Defendant-appellee contends that the court properly permitted the jury to consider the chart as a *guide*. There is nothing upon the face of the chart to indicate upon what data the stopping distances are

based or that it involves average conditions. But assuming that the stopping distances shown are the result of average conditions, we are at a loss to perceive how they would furnish *guidance* in a particular case. The chart shows nothing but rates of speed, reaction time and braking distances. It does not indicate what an average driver, car, tire, brake or roadway is. What are the characteristics of the average driver? What is the weight of the average motor vehicle? What is an average tire? What kind and in what condition are "good" brakes? What is the composition and condition of an average roadway? The chart does not answer these questions. It furnishes no specific standards by which the facts of a particular case may be evaluated. The parties have had no opportunity to examine and cross-examine those who furnished the data and made the chart to determine its relevancy, if any, to the facts in the case under consideration.

The weight of authority is that charts and tables of stopping distances are incompetent and inadmissible. Such charts are, we assume, based upon experiments conducted by many different motor vehicles and drivers at different times and places. The information contained in the charts is undoubtedly of value in driver education. But in courts of law it is pure hearsay. The factors involved in stopping automobiles are so many and varied that a fixed formula is of slight, if any, value in a given case. The weight of the vehicle, type and condition of tire tread, type and condition of brakes, force with which brakes are applied, type and condition of roadways, and differences in reaction time among individual drivers, are some of the variable factors. A formula, in which so many components are variables and in which there is only one constant (rate of speed), cannot by projection of a positive result (distance), based on speculative averages, be of sufficient accuracy and relevancy to rise of its own force to the dignity of evidence in an actual set of circumstances. This and its hearsay character have led to its rejection as evidence in a large majority of the jurisdictions where the question has been directly raised. *Muse v. Page*, 4 A. 2d 329 (Conn); *McDonald v. Mulvihill*, 202 A. 2d 213 (N.J.); *Smith v. Hardy*, 88 S.E. 2d 865 (S.C.); *Breshears v. Myers*, 266 S.W. 2d 638 (Mo.); *Tuite v. Union Pacific Stages*, 284 P. 2d 333 (Ore.); *Lemons v. Holland*, 286 P. 2d 656 (Ore.); *Thedorf v. Lipsey*, 237 F. 2d 190 (CC, 7C). However, there are decisions to the contrary. *Steffes v. Farmers Mutual Auto. Ins. Co.*, 96 N.W. 2d 501 (Wis.); *Mainz v. Lund*, 119 N.W. 2d 334 (Wis.). There are also some cases in which the tables have had appellate application or have been referred to with intimation of approval. *Dupre v. Union Producing Co.*, 49 S. 2d 655 (La.); *Wilson v. Williams*, 82 S. 2d 71 (La.); *Autrey v. Swisher*, 155 F. 2d 18 (CC, 5C).

We adopt the majority view and hold that the published tables of stopping distances are inadmissible.

The effect of the ruling of the judge below was to take judicial notice of the information contained in the chart. In a great majority of cases, in which the problem has been presented, the courts have ruled in favor of taking judicial notice of reaction time and stopping distance. But in the overwhelming majority of these cases the courts declined to take judicial notice of precise reaction time or stopping distance; they took notice only "within judicially recognized limits," *e.g.,* that a car travelling at 5 to 10 miles per hour when 30 to 40 feet from a railroad crossing "could have been stopped almost instantly," *Jeffries v. Powell,* 221 N.C. 415, 20 S.E. 2d 561, and that a car travelling at 33 miles per hour could have been stopped within 480 feet, *Reece v. Reed,* 326 S.W. 2d 67 (Mo.). There are a few cases in which the courts have taken judicial notice of precise stopping distances set out in published tables. See *Rodi v. Florida Greyhound Lines, Inc.,* 62 S. 2d 355 (Fla.); *Goldsmith v. St. Paul Mercury Indem. Co.,* 123 S. 2d 797 (La.). For an exhaustive discussion of the problem of judicial notice of reaction time and stopping distances, see "Anno: Evidence — Car — Stopping Distance," 84 A.L.R. 2d 979-990.

We hold that it was improper for the court to take judicial notice of the information contained in the chart presented in this action. "Courts take judicial notice of subjects and facts of common and general knowledge." *Dowdy v. R. R.,* 237 N.C. 519, 75 S.E. 2d 639. A matter is the proper subject of judicial notice only if it is "known," well established and authoritatively settled. Matters of which a court will take judicial notice are necessarily uniform or fixed and do not depend on uncertain testimony. A disputable matter cannot be classified as common knowledge and will not be judicially recognized. *McCoy v. Gilbert,* 169 N.E. 2d 624, 84 A.L.R. 2d 964 (Ohio) — dealing with the problem of judicial notice of tables of stopping distances.

In Virginia there is a statute providing that courts shall take judicial notice of a table of speed and stopping distances (set out in the statute), but that the table raises no presumptions. The statute also requires the courts to take notice that the table is "the result of experiments made with motor vehicles, unloaded except for the driver, equipped with four wheel brakes, in good condition, on dry, hard, approximately level stretches of highway free from loose material." Code of Va., § 46.1 — 195. We have in North Carolina no such legislative sanction or requirement.

The trial judge states in the charge that "In two recent cases our Supreme Court referred to this (Driver's Refresher) manual." He concluded therefrom, we presume, that the chart in question was compe-

tent evidence and a proper subject of judicial notice. Defendant-appellee asserts that we have so ruled. It is true that this Court has in a few cases made casual reference to stopping-distance tables. *Brown v. Hale,* 263 N.C. 176, 139 S.E. 2d 210; *Clayton v. Rimmer,* 262 N.C. 302, 304, 136 S.E. 2d 562; *Ennis v. Dupree,* 262 N.C. 224, 229, 136 S.E. 2d 702. The references were rhetorical and illustrative rather than judicial notice to support decision. In none of the cases has the information contained in the indicated table formed the controlling or even a significant collateral basis for decision. These cases may be construed, perhaps, to fall within that class of cases in which judicial notice of stopping distance is taken "within judicially recognized limits," not of precise stopping distances. See *Burgess v. Mattox,* 260 N.C. 305, 132 S.E. 2d 577. The references may have been misleading. But we now make it clear that such tables are not admissible as evidence in the trial of cases and are not proper subjects of judicial notice for the purposes of trials of cases in Superior Court.

There must be a new trial of plaintiff's cause of action.

We now consider the appeal of defendant, Donald Wayne Vestal. It raises two questions: (1) Did the court err in overruling said defendant's motion for nonsuit of plaintiff's action; (2) did the court err in sustaining plaintiff's motion for nonsuit of said defendant's counterclaim?

(1) Plaintiff contends that the judgment below was favorable to defendant-appellant, he is not aggrieved by the judgment and his appeal should be dismissed. It is well settled that when a judgment is favorable to a party and he does not desire a new trial or modification of the judgment, his appeal based on some supposed error in the trial will be dismissed. *Teague v. Power Co.,* 258 N.C. 759, 129 S.E. 2d 507; *Hooper v. Casualty Co.,* 233 N.C. 154, 63 S.E. 2d 128; *McCullock v. Railroad,* 146 N.C. 316, 59 S.E. 882.

As stated above, there must be a new trial of plaintiff's cause of action. The retrial will proceed upon all of the issues raised by the pleadings — negligence, contributory negligence and damages. The evidence may not be the same as that adduced at the first trial. Defendant-appellant may at the proper time, if he is so advised, move for and have considered his motion for nonsuit. A decision as to whether, on the present record, the evidence makes out a *prima facie* case of actionable negligence as against the said defendant would serve no useful purpose. As to plaintiff's cause of action, defendant-appellant is not aggrieved.

(2) On the other hand, the judgment below is adverse to defendant-appellant on his counterclaim, and as to his cause of action stated in the counterclaim he desires a trial and a favorable judgment. In our opinion the court below erred in nonsuiting his counterclaim. The evi-

dence in the present record will permit, but not compel, a jury to find facts and draw inferences as follows: Defendant-appellant was the owner of the Ford which he parked in front of the Harris home. Plaintiff, had he been keeping a reasonable lookout, could have seen the Ford during the last 300 feet of his approach. He did not apply his brakes or attempt to bring the car he was driving, Oldsmobile, under control until he was 145 feet from the Ford. He was operating the Oldsmobile at a speed greater than was reasonable and prudent under the circumstances and could not bring it under control even by applying brakes. He skidded from side to side, out of control, and collided with and damaged the Ford. Had he maintained control, there was ample space on the hardsurface for him to pass the Ford to the left thereof. There was no other traffic to interfere with his operation. A vehicle, which proceeded in the same direction as plaintiff, had, a few minutes before, passed in safety and without incident. It is true that the violation of the statute relating to "Stopping on Highway," G.S. 20-161, is negligence *per se.* But whether such violation is the proximate cause of injury in a particular case is ordinarily a question for the jury. *Barrier v. Thomas and Howard Co.,* 205 N.C. 425, 171 S.E. 626; *Burke v. Coach Co.,* 198 N.C. 8, 150 S.E. 636. Under the circumstances disclosed by the record, it is a jury question in the instant case.

The court allowed the motion of defendant, Paul David Vestal, for nonsuit. Neither plaintiff nor defendant-appellant appeals from this ruling. It will, therefore, not be disturbed.

On plaintiff's appeal —

New trial.

On defendant-appellant's appeal — Nonsuit of Counterclaim —

Reversed.