**Larry W. ROBBINS, et al., Plaintiffs, Appellants,**

**v.**

**Robert W. WHELAN, Defendant, Appellee.**

**No. 79–1647.**

United States Court of Appeals, First Circuit.

July 7, 1981.

48

Robert W. MacDonald, Bourne, Mass., on brief for appellants.

Thomas D. Burns, James F. Kavanaugh, Jr., and Burns & Levinson, Boston, Mass., on brief for appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

After rehearing and the submission of briefs we withdraw our first opinion and issue the following decision.

This appeal stems from an automobile accident involving a 1971 Mercedes car driven by the defendant-appellee, Robert Whelan, and a second car in which the two plaintiffs-appellants were passengers. The driver of the second car, Curtis Frye, is not a party to this suit. The accident took place as the Mercedes was traveling east on a four lane undivided highway and the Frye car was exiting a rest area, abutting the southern edge of that same highway. The plaintiffs assert that the Mercedes was first

noticed some 700 feet away at the time Frye first approached the highway. Before entering the highway Frye looked in both directions. Upon entering he again looked in the direction of the Mercedes, and this time noticed that it was only 300 feet away and approaching at a speed of about 70 miles per hour. At this point Frye attempted to reenter the rest area. As the resulting collision attests, he was unsuccessful.

The defendant's version claims that he was traveling at about 40 to 48 miles per hour when the Frye car was first noticed some 750–900 feet away advancing in the rest area in the opposite direction. The defendant says he maintained his speed up to a point where the Frye car entered the highway in a "sudden swerve" which left little time for any reaction. After a bifurcated trial the jury decided the issue of liability in favor of the defendant.

Appellants' first claim of error is that the trial court should have admitted into evidence a copy of a Department of Transportation National Highway Safety Bureau report entitled "Performance Data for New 1971 Passenger Cars and Motorcycles." This report contains information on the maximum stopping distances for all automobiles manufactured in a certain year. Specifically, the plaintiffs sought to introduce into evidence that part of these tables stating that the particular type of automobile driven by the defendant had, when traveling at a speed of 60 miles per hour, a maximum stopping distance of 160 feet

with a light load and 169 feet with a heavy load. The defendant objected to this document on the grounds that it was not relevant. The district court agreed.

■ We think the evidence was relevant.[1] A Massachusetts State Police Trooper previously had testified that the defendant's car, which he thought had been traveling faster than 50 miles per hour, had left 160 feet of skid marks. The braking performance report stated that new cars of the defendant's model required at most 169 feet to stop under the test conditions of 60 miles per hour. If factors other than speed were common to both the test and the accident, the report would have supported an inference that the defendant—who presumably was trying to stop as fast as possible—was in fact driving faster than his claimed 40 to 48 miles per hour.

■ The factors other than speed prevailing both during the test and at the accident were sufficiently similar to allow the jury to hear this evidence. In general, because "perfect identity between experimental or actual conditions is neither attainable nor required ...[,] [d]issimilarities affect the weight of the evidence, not admissibility." *Ramseyer v. General Motors Corporation*, 417 F.2d 859, 864 (8th Cir. 1969) (citations omitted).[2] Each case must be judged under its own particular facts taking into account the specific purposes for which this type of evidence is sub-

---

1. We pause to note an anomaly that not infrequently attends the review of trials—the extensive discussion in the appellate court opinion directed to an incident at trial that received only fleeting attention. Here, for example, appellant called an official of the Registry of Motor Vehicles to testify regarding information from the National Highway Safety Bureau report. Defendant immediately objected that "because there is some agency in Washington that compiles a book of information with respect to various cars and what they might do or will not do under the circumstances, I don't think that has any relevancy, materiality or admissibility in this case."

When read in retrospect, the subsequent colloquy reveals that appellant was referring, none too succinctly, to use of the report as an indirect means of calculating the Mercedes'

speed prior to braking. It appears that the court was considering only the relevance of the report as bearing on inadequate brakes, a factor that was not in issue. Nevertheless, we cannot say that the record is so confused that the point as to relevance was not sufficiently made. That point being preserved, we cannot avoid the analysis that follows.

2. *Cf. Winekoff v. Pospisil*, 384 Mich. 260, 181 N.W.2d 897, 898 (1970) ("our steady experience with automobile negligence cases suggests that these widely published and pretty well understood stopping distances have some value as evidence, provided the proof preceding their admission discloses a fair and relevant reason for submitting them to the jury as an aid to the solution of the ever-present issues of due care and causation").

mitted.[3] In this particular case, although the tests were performed under specific controlled conditions, see 49 C.F.R. § 575.-101(d) and (e) (1980),[4] the defendant has not attempted to demonstrate to us any differences existing at the time of the accident that were significant, except perhaps for the skill of the driver. The evidence that was presented at trial had otherwise established a dry road, no abnormal weather conditions, and a relatively new car in "A–1" condition. On this record the matchup of conditions was sufficient to allow the data to be presented to the jury. It is for the defendant to attack the weight to be accorded such evidence by presenting contrary evidence about how the variance between the test and actual conditions—for instance, as when one car stops with skid marks and the other without—might affect the inferences that the plaintiff urges be drawn.

■ On appeal the defendant alternatively argues that, even if the report were relevant, the trial court properly excluded it because it was hearsay. The Federal Rules of Evidence, however, allow as an exception to the hearsay rule "data compilations, in any form, of public … agencies, setting forth … (C) … factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." Fed.R.Evid. 803(8).[5] The vehicle safety performance report meets the literal requirements of Rule 803(8)(C). It is a data compilation of a public agency. The findings it sets forth are purely factual, and resulted from a detailed inquiry that the agency undertook, see 49 C.F.R. § 575.101 (1980), pursuant to its statutory authority. See 15 U.S.C. § 1401(d). See also Report at i ("This publication is a compilation of data provided by the individual auto manufacturers in response to regulations issued by the Department of Transportation's National Highway Safety Bureau.").[6]

The investigation's "sources of information" and "other circumstances" also demonstrate the resulting report's trustworthiness, thus satisfying the rule's final clause. First we observe that the investigation was completely unrelated to this or other litigation. Its motivation was also otherwise unbiased. The report describes its object by

---

**3.** The fact that the detailed conditions under which the tests for individual models were performed may be easily verified helps distinguish the report in this case from those in which the opaque averaging of generalized results masked variation in the underlying data and created uncertainty about testing conditions. E. g., Hughes v. Vestal, 264 N.C. 500, 142 S.E.2d 361 (1965); McDonald v. Mulvihill, 84 N.J.Super. 382, 202 A.2d 213 (1964).

**4.** The testing conditions and procedures used to compile the information in the 1970 Report have changed very little in 10 years. They are nearly identical to those listed at 49 C.F.R. Part 575 (1980).

**5.** The parties in their briefs have primarily concentrated on the applicability of Rule 803(8)(B), the basis of our initial decision in this case. Upon rehearing we decide that the case is more properly analyzed under Rule 803(8)(C). Cf. 4 D. Louisell & C. Mueller, Federal Evidence § 455, at 729 (1980) ("A public record based upon information supplied by outsiders should be viewed as investigative in nature and examined under clause (C).") We therefore express no view regarding the applicability of Rule 803(8)(B) to the facts of this case.

**6.** We observe that the regulations require manufacturers to provide data to the agency regarding vehicles "manufactured on or after January 1, 1970." 49 C.F.R. § 575.101(b). The agency's investigation of auto safety performance thus is on-going rather than one-time. We do not understand this factor to detract from the status of the agency's efforts as an "investigation."

We also note that this agency's determination of existing vehicles' stopping distances does not present issues arising from a proceeding that "is clearly rule-making—directed in focus to regulation of future conduct, with any fact-finding at most incidental and used primarily for predictive purposes". United States v. American Telephone & Telegraph Co., 498 F.Supp. 353, 360 (D.D.C.1980). Compare Melville v. American Home Assurance Co., 443 F.Supp. 1064, 1112 n. 71 (E.D.Pa.1977) ("An investigation [under Rule 803(8)(C)] is not by its own terms limited to investigation of past events … and the wording of the rule gives no indication that the term might be so limited."), aff'd in relevant part, 584 F.2d 1306, 1315–16 (3d Cir. 1978).

identifying itself as "the second of the Consumer Information Series of publications designed to help you, the consumer, to know more about automobile safety performance." *Id.* Cf. 15 U.S.C. § 1423 (requiring same agency to publish tire grading information "to assist the consumer to make an informed choice"); *Muncie Aviation Corp. v. Party Doll Fleet, Inc.*, 519 F.2d 1178, 1182 (5th Cir. 1975) (trustworthiness assured because publishing agency's "only conceivable interest was in insuring safety").

Next we note that the government agency has by rule established detailed standards by which the private parties are to collect the required data. Published rules direct that braking tests be conducted with a specified poundage on the brake pedal, with the car's fuel tank between 90–100 percent full, and with all vehicle openings in closed position. The ambient temperature must be between 32–100° F. and the wind velocity zero. The test auto may not skid and must remain within a 12 foot lane. Its tire pressure and other relevant component adjustments must comply with the manufacturer's published recommendations. The test road must have a grade of zero percent and the road surface "a skid number of 81, as measured in accordance with . . . (ASTM) Method E–274–70 (as revised July, 1974) at 40 mph, omitting the water delivery specified in paragraphs 7.1 and 7.2 of that method." 49 C.F.R. § 575.101(d)(7) (1980). The regulations also specify testing procedures, including preparatory burnishing,[7] allowable brake temperatures, and measuring methodology. *Id.* at § 575.-101(e).

The government agency requires an extremely strict statistical standard in addition to these detailed testing standards; "[e]ach passenger car in the group to which the information applies shall be capable of performing *at least* as well as the information indicates . . . ." *Id.* at § 575.101(c) (emphasis added). This conservative standard suggests that the average car will have better performance characteristics than the reported information, if there is any variation at all (as is likely) between the performance of individual autos of a given model.

Finally, the supplying manufacturers have a significant incentive to comply with these detailed data reporting requirements. Their failure to do so violates the law, 15 U.S.C. § 1397(a)(1)(E), and renders them liable for civil penalties. *Id.* at § 1398(a).

█ Against these factors, defendant's unsubstantiated suggestion that manufacturers may overstate the performance of their products to induce sales is relevant but insufficient to discharge the burden of showing untrustworthiness that rests on a party opposing the introduction of purported hearsay. *See, e. g., Baker v. Elcona Homes Corp.*, 588 F.2d 551, 558 (6th Cir. 1978).

The indicia of reliability marking this investigation's methodology also allows us to distinguish less reliable reports that have been excluded in other cases. For example, the Consumer Product Safety Commission accident reports we excluded in *McKinnon v. Skil Corporation*, 638 F.2d 270, 278–79 (1st Cir. 1981) and the National Transportation Safety Board accident reports excluded in *John McShain, Inc. v. Cessna Aircraft Company*, 563 F.2d 632, 635–36 (3d Cir. 1977) involve accident reports in which the attendant danger of misrepresentation, found in subjective commentary recorded by investigators from interviewees who witness particular acts in disputes, was never overcome. Here by contrast the performance data report contains the results of objective technical analysis performed under controlled conditions.

---

**7.** An example of the precision required is the set of criteria governing brake burnishing:

"*Passenger Cars.* Burnish brakes once prior to first stopping distance test by conducting 200 stops from 40 m. p. h. (or maximum sustained vehicle speed if the vehicle is incapable of reaching 40 m.p.h.) at a deceleration rate of 12 f.p.s.p.s. in normal driving gear, with a cooling interval between stops, accomplished by driving at 40 m. p. h. for a sufficient distance to reduce brake temperature to 250° F., or for 1 mile, whichever occurs first. Readjust brakes according to manufacturer's recommendations after burnishing." 49 C.F.R. § 575.101(e)(i) (1980).

The defendant argues that Rule 803(8)'s exemption here cannot apply since the information in this data compilation was reported by public officials who personally neither produced the figures not verified their accuracy. He refers us to the Advisory Committee's Notes to Rule 803 that state that Rule 803 does not "dispense[ ] with the requirement of firsthand knowledge."

■ We agree that the reporting agency must have firsthand knowledge *of the investigation* by which it accumulates the published factual findings that Rule 803(8)(C) contemplates, since it is the quality of the investigation that determines the caliber of the results. The agency in this case did have such firsthand knowledge; it initiated the inquiry and specified in detail the information sought, the methodology to be used in developing the information, and the statistical standards to which the manufacturers were to adhere. It then determined that the information was sufficiently reliable to publish for the buying public to rely upon when comparing car safety performances. Our judgment is that these factors, combined with the statutory sanctions compelling the manufacturers' accurate responses, ensured sufficient trustworthiness to allow the report to be admitted without further verification efforts by the agency. *Cf. United States v. American Telephone & Telegraph Co.*, 498 F.Supp. 353, 364 (D.C. Cir.1980) (author of report not necessarily required to have firsthand knowledge of facts on which findings are based); 4 D. Louisell & C. Mueller, Federal Evidence § 455, at 734–35 (1980) ("A great advantage of clause C [of Rule 803(8)] is that it embraces records based upon statements or testimony by outsiders to government, so there is no need to show that the source was an official with personal knowledge.") (footnotes omitted); 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 803(8)[03], at 802–803–04 (1979) (government report may be admissible under Rule 803(8)(C) despite lack of official firsthand knowledge of substance if the report is found reliable).

The court therefore erred in excluding the report.

■ We further conclude that the trial court's exclusion of the performance report was more than harmless error. Fed.R.Evid. 103(a); Fed.R.Civ.Proc. 61; 28 U.S.C. § 2111. This case turned in great measure on the critical element of speed. In making this factual determination the jury essentially had before it only the conflicting versions of the two drivers and the defendant's expert witness who testified to the effect that plaintiff's car was traveling at the faster speed at the time of the collision, and that the skid marks on the road were not made by defendant's car. There was no other evidence presented at trial that could serve the same purpose of establishing a relationship between the skid marks and probable speed. *See de Mars v. The Equitable Life Assurance Society*, 610 F.2d 55, 61–62 (1st Cir. 1979) (harmless error when the excluded evidence is cumulative, repetitious, or ambiguous); *see also Garbincius v. Boston Edison Company*, 621 F.2d 1171, 1175 (1st Cir. 1980).

On this close question of negligence it is obvious that plaintiffs' case was made considerably weaker by the error. Because we cannot say with reasonable assurance that the jury, had it been given the opportunity to consider the data, would still have found in favor of the defendant we find no alternative but to remand for a new trial.

■ In light of our disposition of this evidentiary issue it is unnecessary to consider the other contentions raised on appeal. Even were they to resurface upon retrial they would have to be handled in the context of the particular circumstances before the court at that time. For purpose of guidance we do, however, mention that the question of whether an expert witness is necessary or who would qualify as one is, in a diversity case, controlled by the Federal Rules of Evidence. *Garbincius v. Boston Edison Company*, 621 F.2d at 1174.[8]

*The case is remanded for a new trial.*

---

**8.** The plaintiffs' prayer for relief requested that this case be remanded and assigned to a differ-

ent trial judge. They, however, give no specific reason to substantiate this particular request.

LEVIN H. CAMPBELL, Circuit Judge (dissenting).

I agree with the court that under Rule 803(8) the performance data would not be excludable on hearsay grounds. However, I believe the court fails to give adequate attention to the fact that the trial judge excluded the data not on hearsay grounds but for lack of relevance, *and* that appellant never correctly stated the purpose for which the evidence was being offered. Before a party may claim error on appeal in the exclusion of evidence, he must have told the court not only what he intended to prove but *for what purpose.* McCormack, Evidence § 51, at 110–11 (2d ed. 1972), and cases at n.12, and 1978 Supp. at 16, n.12; *see also* Weinstein's Evidence § 103[03], at 103–27, and cases at n.3; I Wigmore, Evidence § 17, at 319–20 and 1980 Supp., cases at p. 97–98; Fed.R.Evid. 103(a)(2); Fed.R. Civ.P. 46. This rule serves important ends. Backlogged courts should not be required to repeat trials (especially civil trials) because the trial judge has excluded evidence for lack of a clear understanding of the proponent's purpose in offering it. Here, plaintiffs' counsel never explained, as he could easily have done, that his purpose was not to show stopping distance at 60 m. p. h. as such, but rather to give rise to the inference, based on a disputed skid mark, that the car was speeding. It seems clear from the judge's remarks that she did not understand that the evidence was being offered for the latter purpose. The document was thereupon excluded for lack of relevance (the hearsay issue was never reached). All this occurred at the end of a week long trial, in a context where the judge could reasonably have felt that matters were being unduly prolonged.

This court skirts the issue in footnote 1. It says that "read in retrospect," the colloquy between court and counsel "reveals that appellant was referring, none too succinctly, to use of the report as an indirect means of calculating the Mercedes' speed

prior to the braking." For this reason, "we cannot say ... that the point as to relevance was not sufficiently made." The rule, however, is not served by looking at the record retrospectively. The reason a party must communicate the purpose for offering evidence is to put the trial judge on notice while there is still time to save the situation. A trial judge is only human; he may not have perfect recall of earlier testimony; it is counsel's duty, not the court's, to articulate the purpose for which evidence is being offered. Nowhere in this record did counsel say something like, "Judge, I am offering this because we earlier had evidence of 160 foot skid marks and this exhibit will show that if it took the car 160 feet to stop, it must have been going faster than 60 m. p. h." Had this been stated, a different ruling might have been rendered.

To be sure, this court may not mean that counsel here actually *stated* the purpose for the evidence, but only that the purpose was so obvious that counsel was excused from stating it. *See* McCormack, Evidence § 51, at 111. Defendant's speed was already in issue, and the judge arguably should have realized how the performance data report, taken with the other evidence, would relate to the question of speed. But I do not think the indirect relationship between speed and skid marks was so obvious that counsel was excused from stating it. It was clear from the judge's comments that she was laboring under the misimpression that the evidence was being offered merely to show when the brakes had been applied. If the point was that obvious, one would have expected the judge to perceive it; the whole object of the rule is to require counsel to articulate the purpose when the judge is likely otherwise to misunderstand. At the end of the colloquy, counsel stated his intention to prove that the Mercedes going 60 m. p. h. could stop in 160 feet; but that was to state matters backwards. He never once stated the data was offered for the purpose of showing that the 160 foot skid marks meant the Mercedes was going faster than 60.

---

28 U.S.C. §§ 114, 455. Because the law of this circuit does not require a different trial judge upon a new trial remanded in a jury case,

*O'Shea v. United States*, 491 F.2d 774, 778–780 (1st Cir. 1974), no further discussion is required on our part.

If I saw evidence of injustice, I might be more tempted to stretch the rule, but I see no such evidence here. Plaintiffs presented their own driver, who testified that the defendant was going 70 m. p. h. or more, as well as the state trooper who testified to his opinion, based on the skid marks, that defendant was going faster than 50—so the excluded evidence would not have established a new point that was not otherwise made. To be sure, the performance data might have corroborated these witnesses, if the jury believed the skid marks came from the Mercedes, which was put in doubt by one of the plaintiffs' own witnesses as well as by defendant's expert. Even so, the test data was refutable by arguments that it applied only to new, mechanically perfect cars driven by professional drivers who did not lock the wheels and skid. (The tests were expressly said to have been conducted without locked wheels; thus for all we know the stopping distances were quite different from those of a skidding car.) If it could conceivably have tipped the scales in a close case, this case does not seem to have been close—the jury was out for only an hour. I think that plaintiffs had their day in court, before a jury and a judge who was fair. I do not think plaintiffs should receive a second trial.