UNITED STATES of America, Plaintiff,

v.

William M. DAVIS, et al., Defendants.

No. CA 90–0484P.

United States District Court,
D. Rhode Island.

May 11, 1993.

See also, 140 F.R.D. 261, 794 F.Supp. 67.

618

Vicki A. O'Meara, Acting Asst. Atty. Gen., Environment & Natural Resources Div., Michele M. Giuliani, Bernard P. Bell, Robert E. Maher, Brian Burke, Trial Attys., Environmental Enforcement Section, Environment and Natural Resources Div., U.S. Dept. of Justice, Washington, DC, for plaintiff.

Deming E. Sherman, Providence, RI, for defendants.

### ORDER

PETTINE, Senior District Judge.

The Memorandum and Order of United States Magistrate Judge Timothy M. Boudewyns filed on March 23, 1993 in the above-captioned matter is hereby accepted pursuant to 28 U.S.C. § 636(b)(1).

SO ORDERED.

### *MEMORANDUM AND ORDER*

BOUDEWYNS, United States Magistrate Judge.

Plaintiff, United States, has moved this Court *in limine* for an Order in the trial of this matter admitting into evidence the November, 1986 final Draft Remedial Investigation Report ("RI Report") for the Davis Liquid Site (the "Site"). Plaintiff argues that the RI Report is either admissible under Federal Rule of Evidence ("FRE") 803(8)(C) as a public report setting forth factual findings of an investigation of the United States Environmental Protection Agency ("EPA") made pursuant to authority of law, or, alternatively, a record of regularly conducted activity pursuant to FRE 803(6). Defendants' oppose this motion on the grounds that, *inter alia*, the RI Report is untrustworthy, and that a motion *in limine* is an improper vehicle for admission of evidence prior to trial.[1]

The RI Report describes the investigative and analytical activities performed on behalf of EPA and contains extensive factual findings by EPA regarding the nature and extent of contamination at the Site, the transport pathways of such contaminants, and the resulting risk to human health and the environment. Among other things, the RI Report contains tables summarizing the results of hundreds of chemical analyses of samples collected from a variety of sources and environmental media on or near the Site, and

---

1. Defendant Clairol has submitted a separate memorandum of law in opposition to the United States' motion for the stated purpose of addressing issues which "peculiarly" relate to Clairol. I have reviewed this memorandum and plaintiffs response and find no meritorious issue which was not or could not have been addressed by liaison counsel in the defendants' briefs. Liaison counsel more than adequately represented the interests of all the "generator defendants."

maps showing the location from which samples were taken.

*The Remedial Investigation*

During at least 1975 through 1978, defendants William and Eleanor Davis operated a hazardous waste disposal facility on their property located between Tarkiln Road and Log Road in Smithfield, Rhode Island. Thousands of gallons of liquid and other chemical wastes were dumped into two unlined pits at the Site. As a result of contamination detected at the Site, the Site was placed on the National Priorities List.[2]

EPA selected Camp, Dresser & McKee, Inc. ("CDM") to conduct the work for a Remedial Investigation/Feasibility Study ("RI/FS") at the Site. EPA selects as remedial contractors only companies that specialize in the field of investigating and cleaning up hazardous waste contamination. CDM is a well-known, widely recognized hazardous waste cleanup consultant.[3]

In November, 1986, the RI Report was approved by EPA and released to the public. The RI Report constitutes a finding by and on behalf of EPA resulting from extensive investigations of the Site conducted pursuant to EPA's authority under Section 104(b) of CERCLA, 42 U.S.C. § 9604(b), and the 1985 National Contingency Plan ("1985 NCP"), promulgated under the authority of CERCLA.[4]

The RI Report is divided into an Executive Summary and eight major sections. The Executive Summary states the objectives of the Remedial Investigation, summarizes the activities undertaken by EPA and the State of Rhode Island at the Site, and summarizes the major findings of the Remedial Investigation. The first section ("Introduction") following the Executive Summary describes the background and history of the Site and the nature and extent of the problem at the Site. It incorporates as Appendix A to the RI Report a summary of the Remedial Investigation field activities. The second section ("Site Features Investigation") describes the

demography, land use, zoning, natural resources, and climate of the Davis Site, an understanding of which is essential to analyzing the human health and environmental impacts of the contamination at the Site.

The third section ("Hazardous Substance Investigation") describes in detail the area-specific and media-specific investigation into the extent of the waste material at the Davis Site. The third section also summarizes EPA's findings regarding the nature of the soil contamination at the Site and the physical and chemical characteristics of the contaminated material. This phase of the Site investigation determined the extent of the waste present at the Site, which waste represents the source of contamination migrating to other media (such as groundwater, surface water and air) and other areas on and off the Site. Appendix C of the RI Report referenced in the third section. contains supporting documentation for field work done for this phase of the Remedial Investigation, and consists of (1) test pit profiles, which reports the types of soils, rock and other materials, as well as the level of groundwater, found in twenty-nine test pits dug at the Site; and (2) results of sampling and analysis of materials removed from the test pits.

The fourth section ("Hydrogeologic Investigation") focuses on the groundwater at the Site, and describes the investigation undertaken by EPA to determine the nature and extent of on-Site and off-Site contamination in the groundwater, to characterize the groundwater flow system, and to identify contamination pathways. The fourth section also sets forth the findings of the hydrogeologic investigation. The fifth section ("Residential Wells") describes the investigation into the extent of contamination in the water wells of neighbors of the Site, and sets forth the findings of that investigation. Appendices D and E of the RI Report contain documentation of field work supporting the findings in the fourth and fifth sections, and include among other things, results of sam-

---

**2.** 40 C.F.R. Part 300, App. B (No. 253) (1991).

**3.** Defendants have raised no substantive challenge to the expertise of CDM in their opposition to this motion.

**4.** Section 105 of CERCLA, 42 U.S.C. § 9605, *and codified at* 40 C.F.R. Part 300 (1986).

pling and analysis of groundwater taken from wells dug at the Site and taken from the drinking water wells of neighbors of the Site.

The sixth section ("Surface Water Investigation") describes EPA's investigation of contamination of surface water, including Latham Brook, and sets forth the findings of that investigation. Appendix F of the RI Report contains documentation of the field work supporting the findings of the sixth section, including among other things reports of the results of sampling and analysis of surface water and sediments of stream beds. The seventh section ("Air Investigation") describes air sampling done by EPA at the Site, and sets forth the results of such sampling.

The eighth section ("Baseline Risk Assessment") consists of EPA's findings with respect to the potential risks to public health and the environment caused by contaminants identified as being present at the Davis site prior to initiation of remedial activities.

*Discussion*

### 1. *Motion in Limine*

■ In their opposition, defendants suggest that a motion *in limine* may not be used to admit evidence prior to trial; rather, it may only be used to exclude evidence. This argument cannot be sustained. Motions *in limine* are heard by the district court pursuant to its inherent authority to manage the course of trial.[5] It is of no importance whether this motion is offered as a motion to admit or to exclude evidence. Ruling on these issues now will avoid a needless, time-consuming dispute in the middle of what is expected to be a very long trial. Therefore, this Court will exercise its discretion to rule on the motion now.

5. *Luce v. United States*, 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 463 n. 4, 83 L.Ed.2d 443 (1984).

6. FRE 901(a) and (b)(7).

7. Liaison counsel conceded the authenticity of the RI Report at the hearing on this motion.

8. FRE 402 provides:
 All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these

### 2. *Authentication*

■ Defendants argue that the RI Report has not been properly authenticated. In cases of public reports, the Federal Rules of Evidence require only that there be evidence sufficient to support a finding that the report is what its proponent claims.[6] Neil Handler, the Remedial Project Manager to the Davis Site, identified this exhibit as a true and correct copy of the RI Report for the Davis Site approved by EPA in November of 1986, and that RI Reports are routinely kept in EPA's records. Therefore, I find that the exhibit has been properly authenticated.[7]

### 3. *Admissibility*

#### a. *Relevance*

■ The initial inquiry in any evidentiary determination of admissibility is whether the evidence is relevant.[8] At the liability trial in this case (the so-called "Phase I" according to the pretrial order), the issue to be determined is whether any defendant is liable to the United States for all response costs incurred or to be incurred at the Site.[9] The results of the chemical analyses performed on samples taken at the Site are centrally relevant to one essential element of each defendant's alleged liability under Section 107(a) of CERCLA: whether there has been a "release, or "threatened release" of hazardous substances at or from the Site.[10] Moreover, the RI Report will be centrally relevant to whether hazardous substances for which the generators arranged for disposal, or that the transporters transported, and which were disposed of at the Site, are of the same kind as those found at the Site.[11] In short, the RI Report is plainly relevant to the issues in this proceeding. The only ques-

rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.
 FRE 402.

9. Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

10. *Id.*

11. *See United States v. Alcan Aluminum Corp.*, 755 F.Supp. 531, 542 (N.D.N.Y.1991).

tion, therefore, is whether its admissibility is otherwise precluded by the hearsay rule.

### b. *Hearsay Exception 803(8)(C)*

■ The RI Report is a collection of out-of-court statements which the United States wants to offer into evidence to prove the truth of the matters asserted in those statements; as such, it is within the general definition of hearsay.[12] Hearsay is not admissible unless an exception to its exclusion exists.[13]

FRE 803(8)(C) provides an exception to the hearsay rule for certain public records. The rule provides in pertinent part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> (8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.[14]

The policy behind this exception is that "public records or reports, by virtue of their being based on legal duty and authority, contain sufficient circumstantial guarantees of trustworthiness to justify their use at trial."[15] The assumption is that public officers will perform their duties, that they lack motive to falsify, and that the public inspection to which the records are subject will disclose inaccuracies.[16] Use of the records or reports also serves the public interest by saving time and the additional expenditure of public money in bringing many witnesses into court to testify about matters that have, in general, been accurately reported and recorded.[17] In CERCLA cases, courts have consistently held that public records excepted from the hearsay rule by FRE 803(8)(C) include precisely the type of data sought to be admitted here—results of environmental investigations of hazardous substances conducted or commissioned by federal and state agencies.[18]

■ The United States has met its burden in proving that the RI Report meets the *prima facie* elements of FRE 803(8)(C). First, the RI Report is a "report of a public agency." Although initially drafted on a contract basis by CDM under the supervision of EPA, courts have held that such closely managed investigations satisfy the "report of a public agency" requirement under FRE 803(8).[19] Here, the EPA remained in charge of and closely involved with the Remedial Investigation at the Davis Site. EPA appointed the Remedial Project Manager ("RPM") for the Site as the primary contact between EPA and its contractor. EPA selected CDM in accordance with its requirements regarding the qualifications for Remedial Investigations. The field work and analysis were performed at the direction and under the guidance of EPA; proposed work plans were reviewed for conformity with EPA methodology and standards. This re-

---

12. FRE 801(c).

13. FRE 802.

14. FRE 803(8)(C).

15. *Ellis v. International Playtex, Inc.*, 745 F.2d 292, 300 (4th Cir.1984).

16. 5 Wigmore, *Evidence* § 1632 at 618–21 (Chadbourn rev. 1974).

17. Michael H. Graham, *Federal Practice and Procedure*, § 6759 at 664 (Interim edition 1992).

18. *United States v. Summit Equipment & Supplies, Inc.*, 805 F.Supp. 1422 (N.D.Ohio, 1992); *United States v. Northernaire Plating Co.*, 670 F.Supp. 742 (W.D.Mich.1987), *aff'd sub nom. United States v. R.W. Meyer, Inc.*, 889 F.2d 1497 (6th Cir.1989), *cert. denied*, 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990); *United States v. Tyson*, 25 Env't Rep.Cas. (BNA) 1897, 1986 WL 9250 (E.D.Pa.1986).

19. The First Circuit has recognized that, in order for a document to qualify as a "report of a public agency," the agency need not have firsthand knowledge of all matters contained in the report, as long as it has "firsthand knowledge *of the investigation* by which it accumulates the published factual findings...." *Robbins v. Whelan*, 653 F.2d 47, 52 (1st Cir.) (emphasis in original), *cert. denied*, 454 U.S. 1123, 102 S.Ct. 972, 71 L.Ed.2d 110 (1981). *See also Tyson*, 25 Env't Rep.Cas. (BNA) at 1094 ("The inclusion of findings made by independent contractors in the ordinary course of this [hazardous waste investigation] business does not preclude the Remedial Investigation Report's admissibility under Fed. R.Evid. 803(8)(C)....").

view included making sure that the contractor followed EPA's quality assurance/quality control guidelines for sampling and chemical analysis. EPA remained in close contact with its contractors during the remedial investigation, and required its contractors to submit regular reports concerning the project. Finally, EPA reviewed prior drafts of the RI Report for technical accuracy and compliance with the 1985 NCP, requiring all necessary changes and additions to ensure the report's accuracy.

■ FRE 803(8)(C) also requires that the document set forth "factual findings." [20] The RI Report contains extensive statements of factual findings on behalf of EPA regarding the nature and extent of contamination at the Site, the presence and quantity of hazardous substances in samples taken from the Site, and the locations from which the samples were taken. These are simple findings of fact within the meaning or FRE 803(8)(C). Second, there are evaluations and conclusions summarizing the results of the chemical analyses of samples from the Site. These fit within the Supreme Court's broad interpretation of "factual findings" in FRE 803(8)(C).[21]

■ Finally, it is also clear that the findings contained in the RI Report result from an investigation "made pursuant to authority granted by law." [22] Section 104(b) of CERCLA, 42 U.S.C. § 9604(b), provides that, whenever EPA has a reason to believe that a release of hazardous substances has occurred or is about to occur, it may

> undertake such investigations, monitoring, surveys, testing and other information gathering as [it] may deem necessary or appropriate to identify the existence and extent of the release or threat thereof, the source and nature of the hazardous substances ... and the extent of danger to the public health or welfare or the environment. In addition, [it] may undertake such ..., studies or investigations as [it] may deem necessary or appropriate to plan and direct response actions, to recover the costs thereof, and to enforce the provisions of this Act.[23]

Pursuant to this authority, Section 300.68(d) of the 1985 National Contingency Plan, which was in effect in 1986, specifically required that a remedial investigation be conducted prior to any decision to undertake remedial action at a site.[24] That requirement has been continued in the National Contingency Plan now in effect.[25] Accordingly, the RI Report was prepared pursuant to authority granted by law.

### c. *Trustworthiness*

■ Once the above-discussed requirements are met, the proffered evidence should be admitted unless the *party opposing the admission of the evidence* makes an affirmative showing of untrustworthiness.[26] This was intended as an "ample provision for escape if sufficient negative factors are present." [27]

The Advisory Committee to the Federal Rules of Evidence has suggested possible factors for consideration on the question of trustworthiness: the timeliness of the investigation, the special skill or experience of the officials making the report, whether a hearing was held and the level at which it was conducted, and the existence of any possible

**20.** Defendants concede that the RI Report contains factual findings.

**21.** *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170, 109 S.Ct. 439, 450, 102 L.Ed.2d 445 (1988).

**22.** Defendants have conceded that the findings contained in the RI Report result from an investigation made pursuant to authority granted by law.

**23.** 42 U.S.C. § 9604(b).

**24.** 1985 NCP § 300.68(d), 50 Fed.Reg. 47969, 47973 (Nov. 20, 1985) (codified at 40 C.F.R. § 300.68(d) (1986)).

**25.** 40 C.F.R. § 300.430 (1991).

**26.** FRE 803(8)(C). *Kehm v. Procter & Gamble Mfg. Co.*, 724 F.2d 613, 618 (8th Cir.1983). It is well-established that the burden of showing untrustworthiness rests on a party opposing the introduction of purported hearsay. *Robbins v. Whelan*, 653 F.2d 47, 51 (1st Cir) *cert. denied* 454 U.S. 1123, 102 S.Ct. 972, 71 L.Ed.2d 110 (1981).

**27.** FRE 803(8)(C) Advisory Committee's Note.

biases or motivational problems on the part of either the investigators or other sources of information.[28] District courts have also added other factors such as the finality of the findings made in the report, the extent to which the report is based upon hearsay, confidential communications or *ex parte* evidence, the extent to which such information is supplied by persons with an interest in the outcome of the case, and where the report purports to offer expert opinion, the extent to which the facts or data are of a type reasonably relied upon by experts in the particular field.[29]

Defendants attack the RI Report's trustworthiness on a number of grounds. They argue that it was not compiled in accordance with the Environmental Protection Agency's own regulations and procedures concerning Quality Assurance and Quality Control standards; that there was an inadequate showing of chain of custody of soil samples allegedly taken at the Site; that the report contains conflicting results for identical samples; that the report is a draft document which was prepared by the EPA in anticipation of this litigation; that it contains multiple-level, inadmissible hearsay statements; and that it is not a final agency finding.

In response, the United States argues that much of the procedures which were followed in compiling the RI Report were provided for and documented as part of the Project Operations Plan ("POP"), submitted by Camp, Dresser and McKee. Specifically, the POP contains the EPA Quality Assurance Project Plan, including quality assurance/quality control requirements, data quality objectives and field sample codes. The POP also includes sampling methods, intended parameters to be tested for in the sample, and data validation requirements.

The United States further responds that the number of samples without chain of custody signatures is small in relation to the total number of samples. With respect to the rest of the samples, routine procedures were followed as dictated by the Statements of Work and Written Standard Operating Procedures in the POP. Likewise, the amount of variation in some of the duplicate sample results was not significant in relation to the number of samples reliably collected, analyzed and reported.[30]

The United States would dismiss the RI Report's use of blank spaces in places where samples were either rejected or not analyzed as well as those where no contaminant was detected. It contends that the use of blank spaces suggests, if anything, that the RI Report understates the amount of contamination. Where a blank space for any contaminant is listed for a sample in a table, it was assumed for purposes of that sample that contaminant was not present. The United States was not relying on the presumed non-detects in proving its case that hazardous substances were released at the Site.

The United States further explains that although the title says "Draft" Remedial investigation, the EPA has accepted, presented and relied on this report as the final report. It also attempts to rebut the defendants' assertion that the RI Report was prepared in anticipation of litigation by pointing out that although the RI Report may be used in cost recovery actions, as an initial matter the statute and the National Contingency Plan ("NCP")[31] require that it be prepared to evaluate the extent of contamination at a Site and to support an agency decision on necessary remedial action. The RI Report has other purposes besides litigation, and it does not rise to the level of untrustworthiness simply because one of its intended uses in cost recovery actions.

Finally, the United States does not dispute that the RI Report contains some hearsay. Instead, they argue that a government record admissible under FRE 803(8)(C) should only be excluded if it is "pervaded" by hear-

---

28. *Id.*

29. *Zenith Radio Corp. v. Matsushita Electric Ind. Co.,* 505 F.Supp. 1125, 1146–47 (E.D.Pa.1980), *aff'd in relevant part* 723 F.2d 238 (3rd Cir.1983).

30. Further, some of the samples with variation were soil samples. A high degree of variation is expected with soil samples because the distribution of contamination is usually not uniform. *See* 10/22/92 Handler Affidavit ¶ 5.

31. 42 U.S.C. § 9604(b); 40 C.F.R. § 300.430.

say such that it becomes untrustworthy.[32] Similar to the rationale in *Rollins v. Board of Governors for Higher Education*,[33] reports such as the report in the instant case do not merely repeat what was told to the investigators by witnesses, but also draw inferences as to what in fact happened. The conclusions cannot be disentangled from the facts.[34] Absent a specific showing of untrustworthiness, such multiple layers of hearsay clearly fall within the scope of FRE 803(8)(C).

After careful review of the defendants' criticisms and the United States' responses, I find no one factor or combination of factors which indicate that the entire document is untrustworthy. The criticisms of the defendants as to minor errors and methodology do not impugn the overall reliability of the RI Report. In an investigation of the magnitude of the RI Report for the Davis Site, it was inevitable that some minor mistakes would be made. Defendants may adequately address their concern about these mistakes at trial to attack the weight given to the Report.[35]

 In addition to defendants' failure in meeting their burden in establishing that the *entire* document is untrustworthy, they have not met their burden in demonstrating that *any specific section* of the RI Report should be excluded or redacted because of untrustworthiness.[36] On the contrary, their arguments are oriented toward the whole document. They contend that "it is not [their] burden to review the RI Report with exacting scrutiny and to tell the Court what

parts may be admissible hearsay and what parts are not." This argument and the case law cited in defendants' briefs supposedly in support of that argument are clearly off point. While it might be true that the burden is normally on the proponent to extract admissible portions from a document otherwise excludable by the hearsay rule, once the *prima facie* elements of FRE 803(8)(C) are fulfilled, *the entire document is presumed admissible,* and the opponent must then demonstrate untrustworthiness.[37]

In fairness to the defendants, they do point to some statements in the RI Report which indicate the presence of hearsay. But, again, the presence of multiple levels of hearsay is only relevant insofar as it relates to the broader inquiry of trustworthiness. After reviewing these and the other arguments of the defendants, and after careful review of the RI Report, I find no section which is so lacking in trustworthiness that it should not be admitted.[38]

*Conclusion*

The United States' motion *in limine* for admission into evidence of the draft remedial investigation report for the Davis liquid site and for expedited consideration is granted.

Furthermore, in the interests of economy of the trial time of this matter and the conservation of judicial resources, counsel for the United States and liaison counsel are directed to discuss whether any portions of this exhibit can be excluded as extraneous,

32. *Zenith*, 505 F.Supp. at 1148.

33. *Rollins v. Board of Governors for Higher Education*, 761 F.Supp. 939, 943 (D.R.I.1991).

34. *Id.*

35. An example of an alleged error which could be adequately addressed at trial would be the absence of chain of custody signatures from some of the samples. On this point, see *Ellis v. International Playtex, Inc.*, where the Fourth Circuit reversed a jury verdict for the defendant and ordered a new trial because the trial court had excluded government epidemiological data based upon insufficient scientific foundation. 745 F.2d 292, 307. The Court of Appeals held that challenges to the methodology of the government's scientific studies "should have been addressed to the relative weight accorded the evidence and not its admissibility." *Id.* at 303. *See also Wolf*

*v. Procter & Gamble Co.*, 555 F.Supp. 613, 625 (D.C.N.J.1982) ("Defendants assert that the research for the [government] studies was hastily conducted and suffered from serious methodological flaws. However, these considerations bear on the weight to be given the evidence by the jury rather than on its admissibility.").

36. A trial judge may exclude specific sections of a report which are proven to be untrustworthy. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167–68, 109 S.Ct. 439, 448–49, 102 L.Ed.2d 445 (1989).

37. *See Zenith*, 505 F.Supp. at 1148.

38. *Ellis v. International Playtex, Inc.*, 745 F.2d 292 (4th Cir.1984).

repetitive or irrelevant.[39] If counsel can come to an agreement as to which portions can be excluded, counsel for the United States shall move for admission of an amended exhibit along with a stipulation signed by liaison counsel.

March 23, 1993.

---

**39.** For example, both parties may wish to agree on the deletion of the section concerning residential well samples, which the United States has suggested is not relevant to this stage of the litigation.